# POLLOCK,
## *Appellant - Cross-Respondent,*
### *v.*
# UNITED GROWTH FUND, INC.,
## *Respondent - Cross-Appellants.*

### (No. 92095, CA 10469)
598 P2d 1285

Lon N. Bryant, Portland, argued the cause and filed the briefs for appellant - cross-respondent.

James N. Westwood, Portland, argued the cause for respondent - cross-appellant. With him on the briefs were Miller, Anderson, Nash, Yerke & Wiener, and Dean D. DeChaine, Portland.

Before Schwab, Chief Judge, and Thornton, Buttler and Joseph, Judges.

BUTTLER, J.

**BUTTLER, J.**

■ This declaratory judgment proceeding was commenced by plaintiff to determine the rights of the parties to the proceeds paid and payable under a contract for the sale of an apartment complex (the Oakmont) which was built by plaintiff Pollock and defendant Watkins, under the circumstances related below. The trial court, sitting without a jury, determined that defendant United Growth Fund (UGF) had the interest it claimed and was entitled to some, but not all, of the money it claimed in its counterclaim. From the judgment entered, Pollock appeals and UGF cross appeals. We treat the proceedings as equitable in nature subject to review *de novo* in this court.

The basic material facts do not appear to be complicated. Pollock and Watkins constructed the Oakmont apartments on land to which record title was in Pollock and his wife and Watkins and his wife. To accomplish the construction work, money was borrowed; the loans were evidenced by promissory notes signed by all four record owners and secured by mortgages from all of them. After the Oakmont was completed, the complex was sold on February 1, 1968, under a land sale contract to UGF for $625,000. Shortly thereafter, UGF sold its vendee's interest in the property on contract to Mr. and Mrs. Thumberg (Thumberg). Toward the end of 1969, Watkins and wife sold their vendors' interest under the contract to UGF and deeded their interest in the Oakmont to UGF, subject to that contract.

On the face of it, it would appear that after the foregoing events occurred the Pollocks and UGF each owned an undivided one-half interest in the real property, subject to the UGF land sale contract. But there are complications. The Pollocks and Watkins contract with UGF provided that the Oakmont was sold,

"* * * for the sum of $625,000.00 on account of which $35,000.00 is paid on the execution hereof (the

receipt of which is hereby acknowledged by the sellers) with the balance of $590,000.00 payable as follows: in monthly payments of not less than $10,280.90 per month each, payable on the 10th day of each month hereafter, beginning with the month of March, 1968, and continuing through the month of July, 1968, thereafter and beginning with the month of August, 1968, in monthly installments of not less than $5,280.90 per month, through the month of December, 1968; and beginning with the month of January, 1969, in monthly installments of not less than $7,780.90 *until such time as the one-half interest of sellers, JOSEPH I. POLLOCK, JR., and ROSE MARIE POLLOCK, husband and wife, has been paid in full, and at which time sellers shall notify buyer, and that thereafter the balance then due on said contract shall be paid in monthly payments of not less than $5,280.90 until the balance of said purchase price is paid in full."* (Emphasis added.)

It is apparent from the emphasized language that there must have been some form of collateral agreement between the Pollocks and the Watkinses with respect to the division of the contract payments, and that the Pollocks would be paid their undivided one-half interest before the Watkinses were paid off. There was, and it requires some explanation.

For some time prior to the Oakmont project, Pollock and Watkins had been engaged in similar activities as a partnership of sorts evidenced by a 1963 memorandum[1] set forth in full in the margin. Their arrangement was very flexible, permitting either

---

[1] That partnership was evidenced by a written memorandum dated March 1, 1963:

"This agreement is to establish a partnership between Joseph I. Pollock Jr. and Herbert T. Watkins Jr. for the purpose of building and owning apartments.

"Joseph I. Pollock Jr. will be a 50% partner and Herbert T. Watkins Jr. will be a 50% partner.

"It is understood that Mr. Pollock and Mr. Watkins may build for themselves and carry on other ventures exclusive of this agreement, and that this agreement will effect only apartments that Mr. Pollock and Mr. Watkins build and own jointly."

party to engage in separate ventures not subject to the "agreement", and each of them had done so. It is not disputed that the Oakmont was subject to the partnership agreement, that is, Pollock and Watkins were to share in the profits therefrom on a 50-50 basis. The evidence supports the conclusion that with respect to the Oakmont, Pollock and Watkins agreed that out of the down payment under the contract, Pollock would receive $25,000 and Watkins $10,000, and that out of the monthly payments Watkins would receive $800 and Pollock would be entitled to the balance after payment of sums due under each of the mortgages on the Oakmont. Under this arrangement, Pollock would be paid off much sooner than would Watkins, and after Pollock was paid his one-half interest, Watkins was entitled to all of the contract payments after making the required mortgage payments.

Pollock, however, would complicate the situation further: he contends that the Oakmont was owned by him and Watkins as tenants in partnership along with any and all other partnership properties and assets, and that under their partnership agreement the parties were to share 50-50 in the net profits, if any, derived from all of those assets and properties. In support of this theory, he says he did not always "draw" the amount to which he was entitled out of the UGF contract payments (*i.e.,* the monthly payments less the mortgage payments and the $800 payable to Watkins); rather, the funds were used for other partnership purposes. The contention ignores the fact that whether he actually took the money, he was entitled to it, and therefore had constructively received it when it was received by the partnership.

■ It is this contention, and the possibly different ramifications that flow from its acceptance, which has complicated this dispute. We need not deal with those ramifications because we conclude, as did the trial court, that the record does not support Pollock's contention. We conclude that while the Oakmont was subject to the "partnership agreement" in the sense

[739]

that Pollock and Watkins were to share 50-50 in the profits derived therefrom, the agreement between them as to how the profits from the Oakmont were to be paid to each of them controls as to the distribution of those profits paid under their contract with UGF, and that UGF was entitled to rely thereon in purchasing Watkins' interest. It may be that as between Watkins and Pollock an accounting is due, but that is not involved in this proceeding. Our only concern is what interest, if any, UGF has in the Oakmont or the contract under which Pollock and Watkins sold it to UGF.

It follows from what we have said that when the Watkinses sold their vendors' interest under the UGF contract, UGF was entitled to receive whatever payments the Watkinses were entitled to receive thereunder. It also follows that pursuant to the Pollock-Watkins agreement with respect to the division of those payments, Watkins was to receive $800 per month until Pollock was paid his one-half interest under the contract, and then Watkins was to receive the remaining payments after the mortgage payments were deducted therefrom. UGF, as the transferee of Watkins' interest, is entitled to whatever Watkins would have been entitled under the contract.

UGF viewed the situation that way, and after it purchased Watkins' vendors' interest it paid to itself the $800 per month which would have been paid to Watkins. Pollock, claiming a default by UGF under the contract, contacted Thumberg and arranged for them to bypass UGF and make their payments to Pollock rather than to UGF. Pollock did not notify UGF, as required by the contract, that the one-half interest of Pollock and his wife had been paid in full. Rather, he continued to receive and retain all of the payments from Thumberg.

The current dispute arose when UGF, after it was placed in receivership, discovered that Pollock had retained profits under the contract in excess of the

amount to which he was entitled in payment of his one-half interest in the Oakmont. Through its receiver, UGF demanded payment from Pollock, and these proceedings followed. UGF filed a counterclaim, claiming the right to such excess payments received and retained by Pollock.

The trial court concluded, as have we, that UGF was entitled to whatever Watkins was entitled to under the contract, and that Pollock had received and retained more of the contract payments than he was entitled to receive in payment of his one-half interest. At the time the trial court rendered its written opinion reaching those conclusions, it stated that if the parties could not agree as to the allocation of the contract payments the court would, upon application, appoint a referee to provide the necessary accounting based on those legal conclusions.

It does not appear that either the parties or their accountants reached complete agreement. Eventually, UGF submitted a proposed decree based upon its accountants' analysis. Pollock objected, and while he did not specifically request the appointment of a referee, he did advise the court that he objected to proceeding "otherwise than as outlined in the final page" of the court's opinion. However, no referee was appointed. The trial court accepted the accounting prepared by UGF's accountant, and it appears to have been prepared on the proper legal bases.

■ We are not in a position to determine whether there are valid objections to accounting methods used in that accounting, and Pollock may wish to challenge them before a referee. For that reason we remand to the trial court for the appointment of a referee if Pollock so requests within 10 days after the mandate is entered. If no request is so made, the accounting accepted by the trial court shall stand, and the judgment and decree originally entered will stand affirmed in all respects. If Pollock requests the appointment of a referee, he shall advance the cost

thereof, subject to the trial court's discretion to require UGF to contribute up to one half of that cost in the event the referee's determination differs from that heretofore made and accepted by the trial court.

■ UGF contends in its cross-appeal that the judgment in its favor should be greater than that awarded by the trial court because, as we understand the contention, its purchase of the Watkinses' interest under the contract amounted, in effect, to a prepayment on the contract in the amount of the principal balance then owing to the Watkinses (approximately $82,000). As a result, it contends the principal balance owing under the contract was reduced, thereby reducing the interest accruing under the contract. The short answer to the contention is that the purchase was not, in fact, a prepayment and was not intended to be treated that way. For example, under the original land sale contract to UGF any prepayments made under the contract were to be applied as prepayments under the outstanding mortgages on the Oakmont. The payment to Watkins in the discounted amount of $45,000 was not so treated and there is no evidence that it was expected to be so treated. There can be no doubt that if a third party had purchased the Watkinses' interest, the obligations of UGF as vendee under the contract would not have been reduced; the fact that UGF is both a vendor and the vendee cannot change the result. UGF is entitled to the same amount Watkins was entitled to receive under the contract, not more; its contention would result in its receiving more.

■ UGF also contends in its cross-appeal that the trial court erred in awarding it attorney's fees only in the amount prayed for in its counterclaim. Plaintiff had stipulated as to the reasonableness of attorney's fees in the amount prayed for, but after the proceedings were concluded, defendant filed a motion for leave to amend its counterclaim to pray for attorney's fees actually incurred. The trial court denied that motion. We cannot say that the trial court abused its discretion in so doing.

[742]

The decree of the trial court is affirmed in part, and the case is remanded for such further proceedings as may be necessary consistent with this opinion. Costs to respondent.